## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

**v.**                                 **Case No. 3:17-cr-240-J-20JBT**

**BERNANDINO GAWALA BOLATETE,**

          **Defendant.**

_____/

### DEFENDANT'S SENTENCING MEMORANDUM

Bernandino Gawala Bolatete, through counsel, submits his Sentencing Memorandum for the Court's consideration in connection with his upcoming sentencing.

## I.    Introduction

Bernandino Gawala Bolatete stands convicted of receipt and possession of an unregistered silencer, in violation of 18 U.S.C. § 5861(d) and 5871. The permissible sentencing range is from probation to 10 years in prison. This Sentencing Memorandum is intended to inform the Court about the 18 U.S.C. § 3353(a) factors that should be taken into account, and the defense's view of what sentence Mr. Bolatete should receive.

## II.    The Guidelines Issue and Our Response to the Government's Motion for an Upward Departure or Variance

The Guidelines Issue

Everyone agrees that Mr. Bolatete's Base Offense Level is 18 and his Criminal History Category is I. However, the U.S. Probation Office and the U.S. Attorney's Office take the position that Mr. Bolatete should receive a four-level enhancement, pursuant to USSG §2K2.1(b)(6), which calls for the increase if the defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense[.]" According to the guidelines commentary, §2K2.1(b)(6) applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." USSG §2K2.1, comment. (n. 14(A)).

Probation's and the government's position is flawed because there is no corresponding felony offense associated with Mr. Bolatete's receipt and possession of the silencer. While it is true that in several conversations with the undercover detective Mr. Bolatete talked about shooting people at the Mosque and shooting the fictional Muslim client the detective complained about, there was never any action taken by Mr. Bolatete that rose to the level of a felony, or any crime at all. The first indication of that is that if the government or state of Florida felt there was probable cause to charge Mr. Bolatete for his statements to the undercover detective, he would

have been arrested long ago. He was not arrested, and the obvious reason for that is that his statements did not amount to a crime.

What's more, other than talk, there is nothing to indicate that Mr. Bolatete actually intended to do violence at the Mosque or to hurt the fictional Muslim. There is not one shred of evidence pointing to Mr. Bolatete taking an affirmative step toward harming anyone. And after initially stating that he was thinking about committing a violent act at the Mosque, Mr. Bolatete told the undercover detective, in no uncertain terms, that he no longer planned to do so, and his focus was on giving his disabled son the opportunity to see America. This information was relayed by the detective to his superior officer during the conversation where the detective told his boss that they would have to step up their game if they were going to get Mr. Bolatete to commit an illegal act. In the end, following rejection by the jury of Mr. Bolatete's entrapment defense, the only illegal act he committed was receipt and possession of the silencer.

The Government's Motion for an Upward Departure or Variance

The government's position that the Court should impose an upward departure or variance is troubling. Without independent evidence, the government asks the Court to find that Mr. Bolatete has shot two people, that he truly planned to go to the Mosque in Jacksonville and commit acts of violence there, and that he intended to shoot the fictional Muslim customer on behalf of the undercover detective. What is

troubling about the government's request is that it flies in the face of the fairness and due process that forms the basis of our criminal justice system.

Starting with the contention that Mr. Bolatete is a "killer" and that he has shot two people, other than Mr. Bolatete's surreptitiously recorded conversations with the undercover detective, the government provides no evidence that Mr. Bolatete has ever shot anyone. We all heard what Mr. Bolatete said to the undercover detective, but with regard to Mr. Bolatete's interactions with the detective, it is our belief that Mr. Bolatete's statements about his past exploits constituted nothing more than an attempt by Mr. Bolatete to show his new friend what a tough character he is. Surely by now—nine months after the statements were made— the F.B.I. could have and should have contacted the law enforcement authorities in the Philippines to see if there is any truth whatsoever to what Mr. Bolatete said, before the making of such a reckless statement. Their silence on the subject answers the question—there is no basis in fact to believe Mr. Bolatete has ever shot anyone.

Moving next to the government's claim that Mr. Bolatete should receive an enhanced sentence because he intended to commit violence at the Mosque and hurt or kill the fictional Muslim customer, again the government asks the Court to effectively convict Mr. Bolatete of uncharged and unproven bad acts, when in reality, he never made one affirmative step towards committing those offenses. The government brashly claims that Mr. Bolatete scoped out the Mosque in the past, but

again, makes this statement devoid of evidence, short of Mr. Bolatete's brags to the detective.

Contrary to the government's hyperbolic assertions that are made without any independent corroboration, there are appropriate, justifiable, and sensible grounds to grant this 70-year old man with no prior criminal history a downward variance on the guidelines. Following, we present additional background information about the 3553(a) factors for the Court's consideration.

**The 18 U.S.C. § 3553(a) Factors**

*"Well Your Honor, I do believe I'd be better off dead, so if you can take a man's life for the thoughts that's in his head ..."*

Nebraska, *Johnny 99,* Bruce Springsteen

In Bernandino Bolatete's native Philippines, there is a term called "kwentong kanto."[1] It's when men, particularly those of Mr. Bolatete's generation, get together and let off steam by fabricating fantastical and wildly hyperbolic stories about how they would deal with some perceived ill in the world. Each one tries to top the other in outrageousness. No one believes, even for a minute, that the stories are true.

---

[1] The undersigned's investigator first encountered this expression, literally translated "street story," in an editorial written in Mr. Bolatete's hometown newspaper, the *Bohol Chronicle Daily,* shortly after his arrest and reached out to the editor for a more thorough explanation. The editorial and emailed explanation from the editor, Bingo Dejaresco, are attached as Exhibit 1. The undersigned subsequently verified Mr. Dejaresco's definition with a Filipino faculty member at the University of North Florida.

This is how Mr. Bolatete's case began.  Mr. Bolatete, 70 years old and in poor health, is a devout Catholic who joined his seven siblings in Florida in 2009 in hopes of eventually bringing his wife and severely disabled son here.[2]   Like most Americans, he was understandably outraged by the Pulse nightclub shooting in Orlando and other gross acts of violence, particularly those perpetrated by people who identified with the radical fringes of the Muslim faith.  In his homeland, the government had just defeated Islamic militants in a brutal five-month battle near his hometown.   He made ill-advised statements in the "we'll-show-them" vein, consistent with kwentong kanto.  When Jacksonville police learned of his comments from a woman that cared for Mr. Bolatete's 95-year-old mother, they rightfully investigated to assess the potential danger.

Turns out, it was all talk.  Mr. Bolatete's family and friends – those who know him best and understand his culture -- said from the beginning that he was nothing but a big talker.   The undercover police detective who befriended Mr. Bolatete seemed headed toward the same conclusion, telling his supervisor Mr. Bolatete was backing off the mosque idea and was most interested in showing his son the United

---

[2] A letter signed by each of Mr. Bolatete's siblings and a letter from the founder of his Catholic community in the Philippines are attached as Exhibit 2.

States "before something happens."[3]

What the detective and his supervisor did not know or consider is that Mr. Bolatete's son Gerry, 45, suffers from a severe and debilitating form of cerebral palsy that will shorten his life expectancy and that requires round-the-clock care. Gerry's most fervent desire is what he calls his "American Dream" -- to see the United States before he dies or is too sick to travel.[4]   That is the "something" Mr. Bolatete worried about happening.

Notably, the government has not prosecuted Mr. Bolatete for terrorism, attempted terrorism, or anything else relating to Mr. Bolatete's foolish and ill-thought out statements about committing acts of violence.  Instead, the government opted to prosecute the charge of possession of an unregistered silencer. There simply was not enough evidence of anything else; had there been, the government would have charged Mr. Bolatete accordingly under Justice Department policy.[5]

---

[3] See the government's Trial Exhibit 6f, which is a transcript of a recorded conversation between the undercover officer and his supervisor a week before Mr. Bolatete's arrest, attached as Exhibit 3.

[4] Photos of Gerry Bolatete being cared for by Mr. Bolatete's wife of 51 years are attached as Exhibit 4, along with notes Gerry typed to his father on a computer using his feet, and a family photo from a Christmas visit by Mr. Bolatete in 2013.

[5] See the attached memorandum by United States Attorney General Jeff Sessions dated May 10, 2017, particularly the second paragraph stating the Justice Department's policy to "charge and pursue the most serious, readily provable offense."  The memorandum is attached as Exhibit 5.

Now the government wants to bootstrap all its unprovable evidence to this case by falsely labeling Mr. Bolatete a "killer" and seeking a sentence well in excess of the guidelines range, with no corroborating evidence save for the words of a "big talker." It is a reasonable assumption that the government, at the very least, asked officials in the Philippines about these alleged shootings there and found nothing.

Tagbilaran City

Bernandino Bolatete -- Nandie to those who know and love him – was born in 1948 and raised in Tagbilaran City in the southern Bohol province of the Philippines. Bohol is in the south-central part of the country. His late father was in law enforcement for 20 years in the Philippines, which fact makes the claim that Mr. Bolatete shot a police officer that much more absurd.

Tagbilaran City is located on the island just to the north of Marawi, where the Islamic State (ISIS) attempted to establish a foothold in May 2017, leading to a fierce military battle with Philippine armed forces. During the crisis, a Catholic priest and several parishioners in Marawi were taken hostage by the militants, who burned down a cathedral. Numerous refugees from Marawi fled to Bohol province, including Tagbilaran City, less than 125 miles away. After five months of fighting,

the Philippine military defeated ISIS in October 2017, but the city of Marawi was left in ruins.[6]

The fighting ended around the time police began surveilling Mr. Bolatete based on his anti-Muslim statements. Before his arrest, Mr. Bolatete was in constant contact with his wife and was well aware of events in his homeland. Mr. Bolatete agrees there is no excuse for his statements. But given the context of the devastation in his homeland, where his wife and disabled son live, it is understandable that Mr. Bolatete would have a heightened sense of concern and agitation.

Work and Family

Mr. Bolatete finished high school in Bohol province and attended college for two years. He spent most of his working years as a sales manager for Panasonic, considered a prestigious position in his homeland. He frequently traveled around the Philippines and Southeast Asia, including Panasonic's headquarters in Japan. As evidenced by the aforementioned editorial in his hometown paper, Mr. Bolatete is well known and well respected in Tagbilaran City.

His closest friend in Jacksonville, Nerio Relampagos, grew up in the same area and knew Mr. Bolatete's family, though he is younger than Nandie and did not know him personally until they met in Jacksonville and bonded over their love of

---

[6] A New York Times video entitled *Inside a Philippine City Seized by ISIS Loyalists,* has been placed on a disk and suppled to the Court, the government, and the Probation Office as Exhibit 6.

target shooting at the Fraternal Order of Police shooting range in St. Augustine.  Mr. Relampagos said people from his region are looked down upon by those in Manila and learn to brag and talk tough to fit in there.  He suspects this is where Mr. Bolatete perfected his habit of bragging, his job with Panasonic frequently taking him to Manila.

When he was 18, Mr. Bolatete married his wife, Artemia, two years his senior.  Sadly, the day of his arrest in this case was their 51st wedding anniversary.  She is a former schoolteacher, who retired to take care of Gerry.  She is now his sole caretaker.

The Bolatetes have three other sons.  One lives in London.  The youngest, Mark Lester Bolatete, works as a nurse in Abu Dhabi, United Arab Emirates.  Mr. Bolatete, in emphasizing that he never actually intended to attack the Mosque, explained that doing so would have endangered the life and well-being of his beloved son, Mark Lester.

While Mr. Bolatete was working for Panasonic, most of his family immigrated to the United States and became citizens.  His brother, Pedro, now 67, joined the United States Navy and served this country for 22 years before retiring in Jacksonville, his favorite duty station.  His military service provided the family a path to American citizenship.  Mr. Bolatete's mother, now 95, resides with Pedro

Bolatete and his wife. Their father died in the United States in 2000 at 77 from heart disease.

Mr. Bolatete retired from Panasonic in 2008 and migrated with his sister, Juanita, to the United States in 2009 as a permanent resident, 28 years after completing his application in 1981. Nandie and Pedro recall that at the last minute his son Gerry's physical condition created a complication with the immigration and it was decided it was in the family's best interest that Mr. Bolatete come alone and his wife would remain in the Philippines to care for Gerry. The plan was that once he became established in the United States, he would take the necessary steps to bring over Artemia and Gerry. His goal was twofold: to work and continue to provide for his family back home and to be able to bring the rest of the family to the United States so that Gerry could realize his "American Dream."

Things did not go as planned. Mr. Bolatete had trouble finding work and moved in with his mother and brother. He found low-paying jobs, first as a housekeeping porter at the Ponte Vedra Inn and Club, then in 2013 as a sales clerk at Wacko's Liquor Store, where he still worked when arrested. He said the neighborhood and clientele at the liquor store were sometimes dangerous and as a small, sickly, older Asian man, he made up stories to exaggerate his toughness in order to protect himself from anyone that might intend harm. Ironically, it was those

same stories that have caused him more legal trouble than he could ever have imagined.

Poor health

The United States Sentencing Guidelines cite age and physical condition as two possible reasons to depart downward from a guideline sentence, particularly in combination and where another form of punishment might be equally efficient and less costly than incarceration.[7] Mr. Bolatete submits that both his age and physical condition, individually and in tandem, are significant factors for the Court to consider in fashioning a sentence that meets the goals of sentencing.

Additionally, Mr. Bolatete submits that a sentence allowing for his immediate deportation from the United States would be a significant punishment in itself that would be equally efficient and less costly than incarceration.  It would protect the public since he would not be permitted to return to the United States and he poses no risk of trying to do so illegally.

Mr. Bolatete is 70 years old and has aged significantly in jail since the undersigned's first meeting with him nine months ago.  Additionally, he suffers from myriad chronic health issues and complications that will require ongoing and costly treatment.

---

[7] United States Sentencing Commission Guidelines Manual, sections 5H1.1 and 5H1.4.

One of his kidneys was removed in 1984 after his doctor discovered an abnormal growth on it. He suffers from stage 3 chronic kidney disease in his remaining kidney.[8] His records indicate he also suffers from diabetes, which is connected to his kidney function issues. He takes insulin for his diabetes. He was treated for open wounds on his ankles in May while at the Nassau County Jail, related to the diabetes. Another complication of his diabetes is that he has diabetic retinopathy in his right eye, a condition that cuts off blood flow to the eyes.

Mr. Bolatete survived a heart attack in 1999. He continues to suffer from hypertension, high cholesterol, cataracts and rheumatoid arthritis. Treatment for the arthritis is tricky because some medications could worsen his kidney disease. He is prescribed medication for all his other ailments. The cost of treating and medicating his various illnesses will be borne by United States taxpayers for the duration of his incarceration if he receives a prison sentence. Worse, if the government's motion is granted and Mr. Bolatete receives a lengthy sentence, he in all likelihood will die in prison.

Despite his numerous physical ailments, his nine months in jail, his conviction at trial, his dim prospects, the guilt of causing his son's "American Dream" to go up in smoke, and the end of his own dreams, Mr. Bolatete has maintained a remarkably

---

[8] Mr. Bolatete's medical records from the Nephrology Associates of Northeast Florida are attached as Exhibit 7.

pleasant and cooperative attitude throughout the duration of this case.  The Nassau County Jail reports no disciplinary actions against him.   Other inmates have remarked on him being a positive force in the jail, leading Bible studies and showing kindness to all he meets.  It has been an honor to represent Nandie Bolatete, and a pleasure getting to know him. The government could not be further off the mark in its harsh assessment of him.

## IV.    Conclusion

Bernandino Bolatete understands that based on his conviction in this case, he will, in all likelihood, be removed from the United States once he serves whatever sentence the Court imposes. He is willing and prepared to expedite that process, by agreeing not to challenge his removal.

At the time of sentencing, Mr. Bolatete will have served nine months in prison. It is submitted that a sentence of nine months is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Respectfully submitted,

Donna Lee Elm
Federal Defender


_s/ Mark Rosenblum_
Mark Rosenblum
Florida Bar No. 0289175
Assistant Federal Defender
200 West Forsyth Street, Suite 1240
Jacksonville, Florida 32202
Telephone: 904-232-3039
Fax: 904-232-1937
E-Mail: mark_rosenblum@fd.org
Attorney for defendant

## CERTIFICATE OF SERVICE

I certify that on August 22, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


_s/ Mark Rosenblum_
Assistant Federal Defender