**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                    Case No.:   3:17-cr-240-HES-JBT

BERNANDINO GAWALA BOLATETE

_____/

**ORDER**

    Before the Court is Defendant Bernandino Gawala Bolatete's Motion for Compassionate Release (Doc. 103 (Motion); Doc. 103-1 through 103-3 (Movant's Exhibits)), which he filed through counsel. The United States has responded in opposition. (Doc. 106, Response). Bolatete has filed a reply brief. (Doc. 107, Reply).

    Bolatete is a 72-year-old inmate incarcerated at Lexington FMC, serving a 60-month prison sentence for one count of receiving or possessing an unregistered firearm silencer. (See Doc. 82, Judgment). According to the Bureau of Prisons (BOP), he is scheduled to be released from prison fewer than 11 months from now, on March 5, 2022. Bolatete seeks early release under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), because of the Covid-19 pandemic, his advanced age, and because he suffers from various health problems. Among Bolatete's underlying conditions are vascular dementia, chronic kidney disease, chronic obstructive pulmonary disease (COPD), type 2

1

diabetes, coronary artery disease (CAD), and hypertension. Bolatete contracted and recovered from Covid-19 in May 2020, and he has since received both doses of the Moderna Covid-19 vaccine. However, he suffered a stroke in late September 2020, and as a result, he suffers from memory loss and impaired cognition. The United States opposes the Motion because it contends that Bolatete has not demonstrated "extraordinary and compelling" circumstances and that the sentencing factors under 18 U.S.C. § 3553(a) do not support a reduction in sentence. The United States argues that Bolatete's conditions are well-managed and do not fully prevent him from providing self-care.

The Court has carefully considered each of the parties' arguments and exhibits, including Bolatete's medical records. For the reasons below, the Motion is due to be granted.

### I.    Compassionate Release

Ordinarily, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). However, compassionate release provides an exception to that general rule. Before passage of the First Step Act of 2018, section 3582(c)(1)(A) left it to the sole discretion of the BOP Director whether to move for compassionate release, and the Director's refusal to do so was judicially unreviewable. See Cruz-Pagan v. Warden, FCC Coleman Low, 486 F. App'x 77, 79 (11th Cir. 2012). But in 2013, the Office of Inspector General for the Department of Justice reported that "[t]he BOP does not properly

manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." Dep't of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (April 2013), at 11, available at https://oig.justice.gov/reports/2013/e1306.pdf.

Perhaps in response to the BOP's failure to properly manage the compassionate release program, Congress devoted part of the First Step Act to "increasing the use and transparency of compassionate release." First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), § 603(b). As a result of the new law, defendants may now move for compassionate release on their own behalf provided that they first satisfy an exhaustion requirement. Section 3582(c)(1)(A), as amended by the First Step Act, now provides:

> **(A)** the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that … extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).

Pursuant to its authority under 18 U.S.C. § 3582(c) and 28 U.S.C. § 994, the United States Sentencing Commission promulgated a policy statement governing the circumstances when compassionate release is appropriate. See U.S.S.G. § 1B1.13. The policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> **(1)**   **(A)** Extraordinary and compelling reasons warrant the reduction; or
> **(B)** The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> **(2)** The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> **(3)** The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The Sentencing Commission has not updated the policy statement since the passage of the First Step Act.

The guideline's commentary provides that "extraordinary and compelling reasons" for compassionate release may exist based on the defendant's medical condition, age, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. 1. As relevant here, these circumstances include:

> **(A) Medical Condition of the Defendant.—**
>
> > **(i)** The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > **(ii)** The defendant is--
> >
> > > **(I)** suffering from a serious physical or medical condition,
> > >
> > > **(II)** suffering from a serious functional or cognitive impairment,
> > >
> > > or
> > >
> > > **(III)** experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Id., cmt. 1(A).[1]

---

[1] The Court recognizes that several circuit courts have concluded that U.S.S.G. § 1B1.13 does not apply to defendant-initiated motions for compassionate release, and therefore does not bind district courts. United States v. Brooker, 976 F.3d 228 (2d Cir. 2020); United States v. McCoy, 981 F.3d 271 (4th Cir. 2020); United States v. Shkambi, No. 20–40543, 2021 WL 1291609 (5th Cir. Apr. 7, 2021) (published); United States v. Jones, 980 F.3d 1098 (6th Cir. 2020); United States v. Gunn, 980 F.3d 1178 (7th Cir. 2020); United States v. Aruda, No. 20–10245, 2021 WL 1307884 (9th Cir. Apr. 8, 2021) (published); United States v. McGee, No. 20–5047, 2021 WL 1168980 (10th Cir. Mar. 29, 2021) (published). The Eleventh Circuit Court of Appeals has not yet ruled on this issue, though the matter is pending in several cases. The Court need not resolve that issue here. For purposes of this Order, the Court assumes that the policy statement is still binding. If it is not binding, such that the Court has greater flexibility to act, its decision would be the same.

When a defendant moves for compassionate release on his own behalf, the compassionate release statute contains an exhaustion requirement. A district court can reduce the term of imprisonment "upon motion of the defendant" only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). As the Sixth Circuit Court of Appeals has held, "[p]risoners who seek compassionate release have the option to take their claim to federal court within 30 days [of submitting a request to the warden], no matter the appeals available to them." United States v. Alam, 960 F.3d 831, 834 (6th Cir. 2020); accord United States v. Smith, 482 F. Supp. 3d 1218, 1222–24 (M.D. Fla. 2020).

## II.  Bolatete has satisfied the exhaustion requirement

The United States concedes that the Court may consider Bolatete's Motion for Compassionate Release, Response at 7 n.3, and the Court agrees. Bolatete submitted a request for compassionate release to the warden of his facility on January 22, 2021. The warden denied the request on February 12, 2021. On March 25, 2021, more than 30 days after submitting his request to the warden, Bolatete filed the instant Motion. As such, Bolatete has satisfied § 3582(c)(1)(A)'s 30-day exhaustion alternative.

**III.  Bolatete has shown extraordinary and compelling reasons**

The Court finds that Bolatete has demonstrated "extraordinary and compelling reasons" for compassionate release under 18 U.S.C. § 3582(c)(1)(A). As noted before, a defendant demonstrates the existence of extraordinary and compelling circumstances if he or she is suffering from "a serious physical or medical condition," "a serious functional or cognitive impairment," or is "experiencing deteriorating physical or mental health because of the aging process," where the condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" and it is one "from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. 1(A)(ii). Bolatete's status meets that standard, even putting aside the Covid-19 pandemic.

The medical records demonstrate – and the parties do not dispute – that Bolatete suffers from a number of chronic conditions. (See Doc. 103-2, Bolatete's Medical Records; Doc. 106-1, Supplemental Medical Records). Bolatete, who is 72 years old, suffers from Stage III or Stage IV chronic kidney disease, COPD, coronary artery disease, Type 2 diabetes, age-related cataracts, glaucoma, and hypertension, among other things. (Doc. 103-2 at 4, 6–7, 21). He has a history of myocardial infarction (heart attack) and he has one kidney. (Id.). He is prescribed a laundry list of medications to manage his conditions. (Id. at 4–5, 13–16).

7

Adding to these ailments, Bolatete is diagnosed with vascular dementia, the result of a serious stroke he suffered in late September 2020. (See id. at 54–59; see also Doc. 106-1). On September 27, 2020, Bolatete presented to the emergency department at his facility for an evaluation of his altered mental status (AMS) after he displayed "acute mental changes." (Doc. 103-2 at 54, 57). According to staff, Bolatete had not left his bed for two days, he had ingested little food or water, and he was not responding appropriately to questions. (Id. at 57). Upon his arrival to the emergency department, a computed tomography angiography (CTA) was performed that "showed occlusion of the left PCA [posterior cerebral artery] at the anterior P2 segment." (Id. at 54). By this time, Bolatete was outside the window for a thrombectomy or receiving tPA (a clot dissolving medication). (Id.). Bolatete was transferred to a community hospital before being referred to the University of Kentucky's medical center. Over the next couple of days, Bolatete continued to experience headache, numbness of the lower extremities, and confusion. (Id. at 58). A CTA revealed "loss of gray-white [matter] differentiation in the medial aspect of the left occipital lobe, and adjacent periventricular mid and posterior left temporal lobe consistent with recent ischemic insult." (Id.).

Bolatete was discharged from the hospital in October 2020. However, he continued – and still continues – to show signs of memory loss and cognitive impairments as a result of the stroke. A medical evaluation performed shortly

8

after the incident, on October 22, 2020, reflects Bolatete's degraded mental functioning. Although Bolatete remembered his name and date of birth, he did not know his age, where he was, or why he was at Lexington FMC. (Id. at 19). According to the report, "[h]e does not remember to eat and needs to be directed by staff to eat." (Id.). In addition, Bolatete was unable to demonstrate (1) an understanding of his medical state, (2) an appropriate level of appreciation regarding his medical state, or (3) an appropriate level of reasoning ability regarding his medical treatment. (Id.). During an encounter the following day, Bolatete "was oriented to self only." (Id. at 17). He believed he was 64 years old and living in the Philippines. (Id.). Bolatete was not aware that he was in the United States or in a federal prison. (Id.).

Although Bolatete has made strides toward recovery since then (see id. at 1), he still displays substantial cognitive impairments. During a psychiatric consultation on March 12, 2021, Bolatete stated he was experiencing forgetfulness, difficulty memorizing new information, sadness, and difficulty sleeping. (Doc. 106-1 at 1). The doctor who conducted the evaluation reported:

> Mr. Bolatete arrived at his appointment on time and accompanied by two correctional officers. He used a wheelchair to ambulate due to back pain, though he indicated that he uses wheelchairs as infrequently as possible. He evidenced a subtle bilateral upper extremity tremor and appeared to have a weak pencil grip during motoric tasks. He spoke accented English and frequently repeated himself in conversation (e.g., he told the same joke 4+ times and evidenced perseveration [repetitive speech] when discussing his arrest and his inability to help his family in the Philippines). He

9

> required several reminders to keep his mask on throughout the evaluation, and memory lapses were evident throughout the evaluation. For example, after taking a break from testing to complete the clinical interview, he forgot that the examiner had informed him that testing would resume thereafter. Further, he denied he ever tested positive for COVID-19, but when asked about recent hospitalizations, he was able to recall that he was admitted last year for breathing difficulties. When informed that the hospitalization was due to a positive COVID-19 test, Mr. Bolatete appeared surprised and concerned, stating that no one had informed him he had COVID-19. Throughout the testing portion of the evaluation, he appeared to remain focused, though he worked very slowly.

(Id. at 1–2). The doctor noted that, for someone with Bolatete's age and medical conditions, he "performed within expectations … on an embedded performance validity evaluation." (Id. at 2). However, the doctor found that his "[o]verall mental status score was well below expectations due to reduced performances in the initiation/perseveration and memory domains." (Id. at 4). Based on a battery of tests, the doctor found that Bolatete suffered significant deficits in memory and other areas of cognitive performance. The doctor concluded that Bolatete suffers from "[m]ajor neurocognitive disorder due to vascular disease," i.e., vascular dementia, and expressed concerns about his memory deficits. (Id. at 5). The doctor recommended that Bolatete receive "continued monitoring and stabilization of vascular risk factors," "ongoing care through the neurology memory disorders clinic," and that following his release from prison "he will likely require significant support, including placement in an assisted memory care living facility and an appointed guardian to aid in legal, financial, and

10

medical decision-making." (Id.).

Moreover, Bolatete's impairments interfere with his ability to provide self-care in the prison environment. Since his stroke, Bolatete has been prescribed daily assistance with "ADL's" (activities of daily living). (See Doc. 103-2 at 2). He has required assistance with such things as bathing and showering. (Id. at 10–12). Bolatete's prescription for assistance with ADL's was renewed for another 90 days as recently as January 12, 2021, reflecting that Bolatete still requires assistance with caring for himself. (Id. at 2).

The United States argues that Bolatete's conditions do not amount to extraordinary and compelling circumstances because his condition has improved since the stroke, such that he can read, tell jokes, walk without assistance, and feed, wash, and dress himself. Response at 4. It is true that Bolatete's condition has improved somewhat since the stroke. But as discussed above, Bolatete continues to be prescribed assistance with the activities of daily living. And a psychiatrist recently reported that Bolatete suffers from a major neurocognitive disorder, such that he would benefit from assisted living and the appointment of a guardian. The commentary to the relevant policy statement, U.S.S.G. § 1B1.13, does not require that a condition altogether destroy an inmate's ability to provide self-care within the prison environment to qualify as a serious medical condition. Rather, the commentary states that the condition or impairment must be something that "substantially diminishes the ability of

11

the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. 1(A)(ii). Therefore, that Bolatete can perform some basic tasks on his own does not defeat a showing of extraordinary and compelling circumstances. Bolatete's vascular dementia and other health issues "substantially diminish" his ability to provide self-care within the prison environment, and they are not conditions from which he is expected to recover.

The United States also argues that Bolatete does not qualify for compassionate release based on Covid-19 because he has been fully vaccinated, and because he contracted and recovered from Covid-19 in May 2020. However, the Court finds that Bolatete has demonstrated extraordinary and compelling circumstances independent of, and without regard to, the Covid-19 pandemic.

Accordingly, upon careful review of the parties' arguments and the record, the Court finds that Bolatete has demonstrated extraordinary and compelling reasons for compassionate release within the meaning of 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13, cmt. 1(A)(ii).

**IV. Bolatete is unlikely to be a danger to the community**

The Court next considers whether Bolatete is a danger to the safety of another person or to the community, as provided by 18 U.S.C. § 3142(g). See U.S.S.G. § 1B1.13(2). In doing so, the Court considers such factors as "the nature and circumstances of the offense charged," "the weight of the evidence

12

against the person," the "history and characteristics of the person," including the person's "mental and physical condition," as well as "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

Following a jury trial, Bolatete was convicted of one count of receiving or possessing an unregistered firearm silencer, in violation of 26 U.S.C. §§ 5861(d) and 5871. To be sure, the circumstances surrounding the conviction were alarming. In the fall of 2017, the Jacksonville Sheriff's Office (JSO) received a tip that Bolatete had expressed animus toward Muslims, and the confidential source feared that Bolatete might carry out a shooting at a local mosque. (Doc. 73, Presentence Investigation Report [PSR] at ¶ 4). The FBI and JSO launched an investigation to prevent any attack, which included introducing Bolatete to an undercover detective (UC). (Id.). Bolatete and the UC developed a rapport and spent time together going to shooting ranges. At one point, the UC "expressed his frustration with Muslims and Bolatete responded in kind." (Id.). The UC brought up a fictitious Muslim customer with whom he was having problems, and Bolatete suggested killing the individual. (Id.).

> However, during a subsequent in-person conversation during which the UC showed Bolatete an AR-15 rifle with a silencer, Bolatete discouraged the UC from harming the individual. Also, when the UC offered to assist the defendant with carrying out an assault on a local mosque, Bolatete became quiet and distant.

(Id.). Bolatete disavowed an intent to shoot up the mosque, explaining that he

13

wanted to bring his son in the Philippines (who has cerebral palsy) to the United States (see Doc. 92, Sentencing Transcript Vol. I at 13), and the Court found that Bolatete had withdrawn from such an idea (see Doc. 93, Sentencing Transcript Vol. II at 10). However, Bolatete later expressed interest to the UC in buying an unregistered firearm silencer, and he continued to have discussions with the UC about the fictitious Muslim customer. Bolatete's conversations with the UC suggested that Bolatete might use the silencer to facilitate an attack on the fictitious individual. Indeed, the Court sustained a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) based on a finding that Bolatete obtained the silencer with knowledge, intent, or reason to believe it would be used in connection with committing a felony offense against the fictitious Muslim person. (Doc. 93 at 10–11); (PSR at ¶ 15). The Court notes, however, that Bolatete's conversations turned toward shooting the individual in the leg rather than killing him or her. (Doc. 93 at 11).[2]

The Court has carefully considered the nature of the offense and its surrounding facts. However, the Court finds that Bolatete is unlikely to pose a danger to the community or to another person for at least three reasons. First is Bolatete's deteriorating mental and physical condition. Not only does he

---

[2] The United States also notes that Bolatete once boasted to the UC about having shot two people in the Philippines. Response at 2. However, there is no evidence that Bolatete ever committed such offenses, and there is no criminal record indicating that Bolatete was ever suspected, let alone convicted, of committing such crimes in the Philippines.

14

suffer from serious physical ailments, such as COPD and chronic kidney disease, he also suffers from severe memory loss, especially as it relates to his short-term memory. Although Bolatete already suffered from several of the same physical ailments before he committed the offense, he had not yet suffered a stroke or been diagnosed with vascular dementia. Thus, his mental status and overall condition have declined markedly since he was convicted and sentenced. In light of his advanced age, declining physical health, and diminished mental status, it is unlikely he has the physical and mental wherewithal to carry out a crime of violence. Second, Bolatete will not remain in the United States for long. He is subject to a detainer by Immigration and Customs Enforcement (ICE), and he is willing to voluntarily self-deport to the Philippines, where his family will help care for him. (See Reply at 4; Doc. 92 at 32). Even if he is not deported immediately, the Court believes that ICE and/or the Probation Office are capable of ensuring that Bolatete is properly supervised in the meantime. Third, Bolatete had no prior convictions or criminal history outside the current offense. Given his age and otherwise nonexistent criminal record, the Court does not believe he poses a threat.

Based on the foregoing, the Court finds that Bolatete does not pose a danger to the safety of another person or to the community within the meaning of U.S.S.G. § 1B1.13(2) and 18 U.S.C. § 3142(g).

## V.     18 U.S.C. § 3553(a) supports compassionate release

Finally, the Court must consider whether the sentencing factors under 18 U.S.C. § 3553(a) support reducing Bolatete's sentence. 18 U.S.C. § 3582(c)(1)(A). Such considerations include the nature and circumstances of the offense, the history and characteristics of the defendant, the types of sentences available, as well as the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, promote respect for the law, and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a). In view of all the applicable § 3553(a) factors, the Court concludes that a reduction is warranted.

The Court reiterates that it has considered the nature and circumstances of the offense of conviction. 18 U.S.C. § 3553(a)(1). This factor will often carry considerable weight in the § 3553(a) analysis. However, this factor is merely one among many that the Court must weigh and evaluate. It is not an absolute bar to relief under § 3582(c)(1)(A) where, as here, other factors weigh strongly in favor of reducing the defendant's sentence. The Court also observes that there was mixed evidence as to whether Bolatete would have carried out an act of violence. On one hand, there was troubling evidence that Bolatete volunteered statements about shooting up a mosque and that he offered to harm a fictitious Muslim individual. On the other hand, Bolatete often seemed to

16

equivocate about acting on such talk. There was also some evidence introduced at sentencing that Bolatete was grandstanding. The Court does not know the extent to which Bolatete was serious about committing an act of violence, but it merely observes that there was conflicting evidence as to whether Bolatete would have followed through on his rhetoric. While this by no means minimizes the seriousness of the crime, it is relevant to the nature and circumstances of the offense.

In addition, Bolatete has served a significant majority of his 60-month prison sentence. As of this date, he has been in custody for more than three years and four months, dating from his arrest on December 1, 2017. (See PSR at p. 1). According to the BOP, he is due to be released from prison on March 5, 2022, fewer than 11 months from now. Releasing Bolatete early will not significantly diminish the length of his sentence, and by extension, minimize the severity of the crime.

Nor will releasing Bolatete endanger the public or undermine the sentencing goal of affording adequate deterrence. As discussed under Sections III and IV, Bolatete suffers from serious physical and mental deterioration related to the aging process. He is unlikely to have the capacity to commit further crimes or acts of violence. On account of his age, mental status, and the low likelihood he will recidivate, specific deterrence is not a significant consideration.

The United States argues that Bolatete "has never accepted responsibility for his crime," noting that he appealed his conviction to the United States Supreme Court, which denied his petition for a writ of certiorari only recently. Response at 5; (Doc. 104, Denial of Petition for Writ of Certiorari). The United States also points to Bolatete's statement during his recent psychiatric evaluation, in which he told the doctor he was a "victim of injustice." Response at 5 (citing Doc. 106-1 at 1). The Court declines to penalize Bolatete for exercising his right to petition the United States Supreme Court for a writ of certiorari, which it does not find to be evidence of a lack of remorse. As for Bolatete's recent statement to a psychiatrist that he was a "victim of injustice," three things bear mentioning. First, it is not clear that by calling himself a "victim of injustice" Bolatete was referring to the conviction, as opposed to the length of his prison sentence or something else. At the sentencing hearing, Bolatete offered his "heartfelt apology" and stated he did not intend to carry out acts of violence against the Muslim community. (Doc. 92 at 27). Second, if Bolatete did mean to deny responsibility for the crime, he made the statement to a doctor several months after having suffered a stroke. The Court cannot rule out that his altered mental status may have contributed to him making the remark. Third, even if Bolatete was suggesting he was innocent, the lack of acceptance of responsibility would not pose an absolute bar to relief under § 3582(c)(1)(A), especially in light of the other § 3553(a) considerations. The Court

18

must weigh and evaluate many different factors under § 3553(a), and no single factor is dispositive.

Finally, the Court believes that releasing Bolatete from prison, so that he may return to the Philippines to be cared for by family members, satisfies the need "to provide the defendant with needed … medical care … in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). As detailed in Bolatete's Reply brief (Doc. 107), the Court is satisfied that Bolatete has a supportive family and an adequate plan following his release from prison. The Court is also satisfied that Bolatete can be adequately cared for and supervised during the period between his release from prison and his departure to the Philippines.

Bolatete presents the Court with a set of extraordinary and compelling circumstances – especially regarding his advanced age and declining health – which the Court finds to support compassionate release. Having considered each of the applicable § 3553(a) factors, the Court concludes that a sentence reduction is appropriate.

Accordingly, it is hereby **ORDERED:**

1. Defendant Bernandino Gawala Bolatete's Motion for Compassionate Release (Doc. 103) is **GRANTED**.

2. Bolatete's previously imposed sentence of imprisonment of 60 months is reduced to **TIME SERVED plus 45 days**, for a release date of **May 30, 2021**. Bolatete represents that commercial air travel between the

19

United States and the Philippines is scheduled to resume on May 4, 2021, at which time ICE will commence removing individuals to the Philippines. Bolatete and his family should use the interim period to make arrangements for his release from custody, to finalize any matters regarding deportation, and to arrange for suitable medical care pending deportation if ICE does not detain him. Otherwise, all conditions contained in the Judgment (Doc. 82) remain in effect.

3. The Court appreciates the promptness of the United States and Bolatete's counsel in responding to this matter.

**DONE AND ORDERED** at Jacksonville, Florida this 15th day of April, 2021.

HARVEY E. SCHLESINGER
United States District Judge

lc 19

Copies:
Counsel of record
Defendant
United States Marshals Service
United States Probation Office
United States Bureau of Prisons
Warden, Lexington FMC